OPINION
{¶ 1} This case is before us on the appeal of Elvina Caldas (Elvina) from a final judgment and decree of divorce. In support of her appeal, Elvina raises the following assignments of error:
 {¶ 2} "I. The trial court erred and abused its discretion in determining that Defendant/Appellee should be the custodial parent of the parties' minor child.
 {¶ 3} "II. The trial court erred and abused its discretion in determining Plaintiff/Appellant's marital interest in Defendant/Appellee's business."
 {¶ 4} We find no merit in the assignments of error. Accordingly, the judgment of the trial court will be affirmed.
 I {¶ 5} Carlos Caldas (Carlos) came to the United States from Portugal in the late 1980's to participate in a work/study program with General Motors and the University of Dayton. After attending the University of Dayton for three years, Carlos started his own business in 1991, and called it International Trade Bridge, Inc. (ITB).
 {¶ 6} Elvina and Carlos originally met in 1997 though an internet matching agency. At the time, Elvina was a Russian citizen. Carlos brought Elvina to the United States from Russia, and the couple married in March, 1997. Their marriage was of fairly short duration, as Elvina filed for divorce in July, 2002.
 {¶ 7} Evlina and Carlos are the parents of one son, William, who was born on August 25, 2000. At the time of the trial court's decision in this case, William was nearly four years old, due to the lengthy amount of time the divorce had been pending. The court designated Carlos as the residential parent and legal custodian, and allowed Elvina parenting time in accordance with the court's standard order of parenting time, with the exception that Elvina's alternate weekends would begin on Thursday at 6:00 p.m. and continue until Monday morning at 9:00 a.m. In making this decision, the court considered the recommendation of the guardian ad litem, the testimony, and the credibility and candor of the parties and other witnesses.
 {¶ 8} Elvina claims the trial court abused its discretion in awarding custody to Carlos. In particular, Elvina claims the trial court erred by relying on a "stale" report from the guardian ad litem, and by failing to make express findings under R.C. 3109.04.
 {¶ 9} In making custody decisions, trial courts are guided by the factors set forth in R.C. 3109.04(F)(1), but also have broad discretion.Miller v. Miller (1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846. We review the court's decision for abuse of discretion, which "`connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (citations omitted).
 {¶ 10} Although the factors in R.C. 3109.04(F)(1) must be considered, we have consistently said that the trial court does not have to specifically recite each factor. See, e.g., Thomas v. Thomas (Sept. 17, 1999), Clark App. No. 98CA55, 1999 WL 812385, *2. Instead, we apply "a presumption of regularity, that is, a trial court is presumed to follow the law unless the contrary is made to appear in the record." Id. Accord, Blasko v. Dyke, Montgomery App. No. 19905, 2003-Ohio-6082, at ¶ 9; Goodman v. Goodman, Marion App. No. 9-04-37, 2005-Ohio-1091, at ¶ 18; and Evans v. Evans (1995), 106 Ohio App.3d 673, 677,666 N.E.2d 1176.
 {¶ 11} We have thoroughly reviewed the record in the present case, and find no indication that the trial court failed to follow the law. In this regard, R.C. 3109.94(F)(1) provides that the court shall consider all relevant factors in determining a child's best interest, including the factors specifically outlined in the statute. As pertinent to this particular case, these factors are:
 {¶ 12} "(a) The wishes of the child's parents regarding the child's care;
 {¶ 13} "* * *
 {¶ 14} "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
 {¶ 15} "(d) The child's adjustment to the child's home, school, and community;
 {¶ 16} "(e) The mental and physical health of all persons involved in the situation;
 {¶ 17} "* * *
 {¶ 18} "(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state."
 {¶ 19} A guardian ad litem (Kenneth Krochmal) was appointed in this case, and interviewed both parents, as well as other witnesses. Krochmal also observed the child's interaction with both parents. Following his study, Krochmal issued a report on March 27, 2003, recommending that Carlos be designated the custodial parent and that Elvina be given visitation. Among the factors Krochmal recited was Elvina's expressed intention of relocating to California. However, this was not the only reason for the recommendation. Krochmal noted that Elvina was aware that Carlos could not relocate due to the nature of his business, but had taken the position that she would no longer reside in close proximity even though the parties had a child together. In addition, Krochmal concluded that Carlos had a level of involvement with the child greater than Elvina portrayed. Krochmal further concluded that Carlos epitomized the values of hard work and education, and provided the child with an excellent role model.
 {¶ 20} Also noted in Krochmal's report was the fact that Elvina had left the child unattended at home when he was less than two years old. On that occasion, Elvina drove to Meijer, leaving William alone upstairs in his crib. Elvina claimed she had asked the next door neighbor to watch the child. However, she had actually only left a phone message, which the neighbor did not hear until after the fact, because the neighbor was not home. That night, Carlos arrived home, found his son alone, and called the police. Elvina admitted this incident, and acknowledged at trial that leaving her child alone was unacceptable.
 {¶ 21} A divorce hearing was scheduled for March 24, 2003, but was continued until August 14, 2003, because of surgery performed on Carlos' counsel. Elvina then changed attorneys, and the final divorce hearing was set for January 15 and 20, 2004. In the meantime, the magistrate issued a decision on August 25, 2003, ordering a parenting schedule of alternating weeks for each parent. This schedule was being followed at the time of the divorce hearings, which eventually concluded on April 4, 2004.
 {¶ 22} Neither side asked for an update to the guardian ad litem's report. At trial, the custody witnesses included both parents, the guardian ad litem, the director of William's preschool, and some character witnesses. The guardian reiterated at trial what he had said in his report. He also stressed that Elvina's intent to move to California was not the only reason for his custody recommendation. In particular, the guardian said that Carlos viewed the custody situation as "their" failure that William's parents would not be married. Carlos also wanted the best for William in terms of education and socialization. The guardian ad litem said he did not hear the same things from Elvina. In addition, the guardian said he did not think it would be a good trade-off to move to California with no close family members, no job, and no firm plans, in exchange for moving a child thousands of miles away from his father.
 {¶ 23} Kim McCaslin also testified at trial. McCaslin was the director of the Goddard School, where William had been enrolled for about five months before the hearing. McCaslin recounted various compliance problems the school had with Elvina that it did not experience with Carlos. For example, the State requires the school to keep attendance records, and children must be signed in and out. Carlos signed William in and out, but Elvina did not. Even after McCaslin talked to Elvina about the problem, it did not clear up.
 {¶ 24} Furthermore, on weeks that Carlos was responsible for William, his schedule was very consistent. The child was routinely brought in between 8:30 and 8:45, and was picked up at 3:15 to 3:45 p.m. However, when Elvina had William, he might come in after classes started, or might not come in at all. Elvina's pick-up times varied also, and could be anywhere from 4:30 to 6:00 p.m., when the school closed.
 {¶ 25} When the school began working with William on potty training, Carlos was cooperative about bringing William to school in pull-ups or training pants. However, Elvina did not cooperate at first. There were also problems with Elvina's feeding methods. Parents were required to send lunches to school, and Carlos sent in substantial food that was appropriate for toddlers. In contrast, Elvina sent in baby food, which caused William to steal more substantial food from other children's lunches. Elvina even attempted to sabotage the process by bringing in additional baby food items for William.
 {¶ 26} McCaslin indicated she had also had to speak to Elvina about washing Carlos in the sink when he had dirtied his diaper or pull-ups. Apparently, Elvina washed William in the same sinks where the children washed their hands. Again, Elvina did not comply at first when this problem was brought to her attention. Finally, McCaslin indicated that Elvina did not attend special events, like parties, that the school had for the children.
 {¶ 27} Carlos testified that he had been William's primary care-giver during the past year and a half, other than when the magistrate had ordered the alternate week parenting schedule. Carlos stated that he had a very stable routine with William, while Elvina stayed out all night long on many occasions and did not put William to bed at regular times. She made William adapt to her schedule, and let him stay up late if she decided to go somewhere. The parties lived together for a substantial time while the divorce was pending (up until late July, 2003). Therefore, they would have had an opportunity to observe each other's child care. Elvina claimed that Carlos did not do significant care-taking for the child in the beginning. She did indicate that he later was a good parent.
 {¶ 28} Elvina denied any intention to leave Dayton if she received custody. She also denied being out late many nights. However, there were inconsistencies in Elvina's testimony that cast doubt on her credibility. For example, Elvina denied having a website during the divorce proceedings on which she had claimed to be single. However, an exhibit showing the website was admitted at trial. On the website, Elvina stated that she was "single." On the website, Elvina also indicated, when she was asked where she would like to spend her free time, that she would like to spend it "out of Dayton."
 {¶ 29} Another discrepancy in testimony occurred in connection with Elvina's testimony about finances. After the parties were married, Elvina obtained an associate degree as a network engineer. However, she was not employed during the lengthy divorce proceedings, other than a three month period from June to September, 2003. Elvina testified that there was no court order for Carlos to pay spousal support after she filed for divorce, so he agreed to pay her credit card expenses, agreed that she could live in the marital home, and agreed to pay for her car. In this regard, Elvina testified that Carlos paid the full balance of the credit card bill one or two times, and that he later paid only $300 or $400. This was simply not true.
 {¶ 30} The divorce was filed in July, 2002. For almost two more years, or until sometime in May, 2004, Elvina continued to live in the marital residence, for which Carlos was paying all the expenses. Carlos also lived in the martial home until late July, 2003, at which time he moved out. However, he still continued to pay all expenses for the home. He also paid for Elvina's car.
 {¶ 31} When the divorce was filed, Carlos had been paying the full balance on Elvina's credit card each month. He continued to pay those amounts in full for six more months, during which time the bills averaged around $1,543 per month. The charges began at around only $632 per month in August, 2002, but increased significantly thereafter. For example, charges for the billing cycle ending on October 17, 2002, were $1,874. The charges continued at this level for several months, during which time Carlos paid the amounts in full.
 {¶ 32} After Carlos paid the $1,988.70 bill in full for the credit card cycle ending on January 16, 2003, Elvina's charges for the next month increased to about $2,119. Carlos paid $750 on this amount, and the following month, the credit card charges increased another $2,560. Among the expenses was a plane ticket to visit California, which was one of three trips Elvina took to California after the divorce was filed. Carlos paid $750 on this bill and then filed a motion on April 22, 2003, asking the court to set temporary support. In the motion, Carlos noted that Elvina's normal credit card charges had doubled since August, 2002. He asked that minimal spousal support be set, because he was also paying the expenses for the marital property. Subsequently, in August, 2003, the magistrate ordered that Carlos should continue to pay expenses for the martial residence, and should pay Elvina spousal support of $250 per month. He was also ordered to pay child support of $750 per month.
 {¶ 33} In view of the above discrepancies in Elvina's testimony, as well as some of the facts established, the trial court would have been justified in finding that Elvina intended to relocate to California. However, the court did not base its decision on that fact. The court noted that Carlos was a good role model and had an appropriate care plan in effect for William. The testimony supports these conclusions. It also supports the finding that awarding custody to Carlos is in William's best interest.
 {¶ 34} Pertinent to R.C. 3109.04(F)(1)(a), both parents wished to have custody of William, and both agreed that the alternate week parenting plan did not adequately meet his needs. In fact, both parents felt William would do better with one parent as primary caretaker. The trial court recognized that both parents wanted the child, but felt Carlos would be the more appropriate person for that role. The court also considered William's interaction with his parents, including the fact that the father's involvement was greater than what the mother had portrayed. The court additionally noted that Elvina had left her young child alone at home, unattended. See R.C. 3109.04(F)(1)(c) (factor involving child's interaction with parents).
 {¶ 35} In view of William's relatively young age, his adjustment to school and community are not as potentially significant as they might be in later years. However, the record amply demonstrated that Carlos provided a stable home and that William should remain where he has greater consistency of care. R.C. 3104.09(F)(1)(d) and (e). Finally, the mental and emotional health of all persons involved in the situation was not really at issue. Both parents are relatively young and neither has any health problems.
 {¶ 36} We must stress that:
 {¶ 37} "[t]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record." Miller, 37 Ohio St.3d 71, 74, citing Trickey v. Trickey (1952), 158 Ohio St. 9, 13, 106 N.E.2d 772.
 {¶ 38} The trial judge was in the best position to decide credibility, and chose to believe those witnesses who found Carlos a more appropriate caretaker. This was a reasonable decision, and was not an abuse of discretion. Accordingly, the first assignment of error is without merit and is overruled.
 II {¶ 39} In the second assignment of error, Elvina challenges the trial court's decision to award her only $1,100 as her share of the marital interest in ITB. At trial, both sides presented testimony from experts who had valued the corporation. As was noted earlier, Carlos started ITB in 1991, before the parties were married. ITB is an 8A company, and receives preferences in government contracting because of its minority ownership. The 8A designation remains in effect only for nine years, after which time the company "graduates" and must compete for government contracts with large corporations. During the marriage, Carlos owned a 72% interest in ITB.
 {¶ 40} For purposes of deciding the marital interest, the experts chose a valuation date of December 31, 2002. Elvina's expert (Duane Kruer) assigned a zero value to ITB before marriage, based on the fact that ITB was losing money at that point and had a fairly significant retained deficit. Kruer arrived at a marital value of $175,845 by using the "capitalized earnings" method. To calculate value, Kruer selected the four most recent years of company earnings. However, he did not include 1998 and prior years because the company was smaller at that point.
 {¶ 41} Kruer began with net income before taxes in the years 1999 through 2002, added back interest expense, and averaged the four periods . He deducted an income tax cost to the average earnings to arrive at an average net income, and then divided the average net income by a 23.1% capitalization rate, which reflected the risks of the company. Kruer then adjusted the income figure further to reflect the fact that the company had a significant amount of liquid assets for its size.
 {¶ 42} John Bosse testified on behalf of Carlos. Bosse assigned a pre-marital value of $27,500 to the company because that is the amount of capital Carlos put into the company when he formed it in 1991. This number was on the tax return prior to marriage as capital and excess paid in capital contributions, and has stayed constant.
 {¶ 43} Bosse used an "adjusted book" method to calculate the marital value of the company. He rejected the capitalization method because that method uses a weighted average to compute an income value that would be used for someone else to come in and buy the business. According to Bosse, such a method is inappropriate for a business in which someone cannot come in and take over the contracts.
 {¶ 44} Bosse classified ITB as a "key-man" business. The reason for this was that contracts were awarded to Caldas rather than the company, due to his security clearance and his minority status. 90% of the company contracts were 8-A (or minority) contracts, and could not be assigned or transferred to someone else. As a result, the contracts were not marketable and the company was also not marketable without a high risk factor or a marketability discount.
 {¶ 45} Additionally, the company loans contained restrictive covenants. For example, the loan covenants prohibited Carlos from selling his interest in the company, and also prohibited ITB from merging with another corporation, from making corporate loans, and from distributing dividends or capital. They also restricted Carlos' salary. In fact, even though Carlos was president of the company, several individuals at ITB were more highly paid. Bosse further noted that if Carlos died, the business would be defunct, and would be in a deficit position because of lease obligations that extended into the future.
 {¶ 46} Based on the above factors, Bosse valued the company during marriage at $164,900, divided by 72% to reflect Carlos' ownership interest. Bosse then applied a marketability discount of 75% to this amount ($118,900), to reflect the high risk of the business. The final figure he arrived at for the marital value of the business was $29,700, as of December 31, 2002.
 {¶ 47} At the time of the divorce hearings, Carlos had just recently received notice from the government that his secret security clearance had been revoked. Carlos was contesting the revocation, but had already lost two contract positions and was in the process of losing the rest of his contracts except for a small NASA job that would probably not be affected. Carlos indicated that his 8-A minority status had also expired in October or November, 2003. As a result, he would thereafter have to compete with large companies for government contracts.
 {¶ 48} Bosse indicated that he did not take the loss of the security clearance into account in valuing ITB, since the valuation date occurred before the clearance problem. However, Bosse did point out that this event illustrated the risk in the business and supported his decision to use a 75% marketability discount.
 {¶ 49} The trial court agreed with Bosse's evaluation and awarded Elvina $1,100, or one-half of the marital value of the company.
 {¶ 50} Elvina contends that the court's decision is unreasonable because ITB has more than 25 employees, has $140,000 in cash, and has $43,000 in an anticipated tax refund. ITB also had sales of between $3,000,000 and $4,000,000 for the year 2002. Elvina claims there was insufficient credible evidence to support the trial court's decision. In particular, Elvina says there is no evidence to support a 75% discount factor, other than Bosse's subjective opinion. Finally, Elvina argues that the trial court should have appointed a third expert to value the company, since the experts disagreed.
 {¶ 51} We find no merit to these claims. In the first place, Elvina waived any error concerning appointment of an expert by failing to object at trial. See, e.g., Schade v. Carnegie Body Co. (1982), 70 Ohio St.2d 207,210, 436 N.E.2d 1001 (a party is precluded from raising error that has not been brought to the trial court's attention at a time when the error could be corrected). Of more importance, however, is the fact that the court did not need a third expert. The experts in this case may have disagreed about the value of the company, but they did not have to agree. The trial court also did not have to use a particular valuation method. Zeefe v. Zeefe (1998), 125 Ohio App.3d 600, 612,709 N.E.2d 208.
We review the trial court's division of marital assets for abuse of discretion. James v. James (1995), 101 Ohio App. 3d 668, 680,656 N.E.2d 399. As the trier of fact, the trial court is responsible for resolving factual disputes and weighing the credibility of testimony and evidence. Covert v. Covert, Adams App. No. 03CA778, 2004-Ohio-3534, at ¶ 17. Consequently, we defer to the trial court because it is in the best position to view witnesses, "observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id.
 {¶ 52} As we said, the trial court agreed with Bosse's evaluation. Bosse was a well-qualified expert who had done business evaluations for more than twenty years and had been a court-appointed expert many times. His decision to discount marketability was reasonable in view of the risky nature of the business and the loan covenants. Furthermore, although Bosse did not take loss of the security clearance into account in determining marital value, the fact that it happened does indicate that the business involved a high degree of risk.
 {¶ 53} Because the trial court acted reasonably in adopting the opinion of one expert over another, we find no abuse of discretion in the division of the marital assets. Accordingly, the second assignment of error is without merit and is overruled.
 {¶ 54} Based on the preceding discussion, both assignments of error are overruled, and the judgment of the trial court is affirmed.
Wolff, J., and Young, J., concur.
(Hon. Frederick N. Young, Retired from the Court of Appeals, Second Appellate District, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio).