OPINION
{¶ 1} Marion K. Hamilton ("Ken") appeals from a final judgment and decree of divorce in the Common Pleas Court of Montgomery County. In support of his appeal, Ken assigns the following errors for our review: *Page 2 
 {¶ 2} I. "The Trial Court erred by finding Appellee [Lori E. Hamilton, nka Lovelass] the custodial and residential parent of the minor children and that there was no alienation of the children by Appellee."
 {¶ 3} II. "The Trial Court erred by ordering the Standard Order of Parenting Time of Montgomery County, Ohio, based on Appellant being the primary caretaker the three years previous to the Appellee's filing."
 {¶ 4} III. "The Trial Court erred by allowing Ms. Hoefflin to testify as an expert, given her prior relationship with Appellee."
 {¶ 5} IV. "The Trial Court erred by not addressing certain marital debts paid by Appellant during the time the parties were separated in 2005 but not reimbursed by Appellee."
 {¶ 6} V. "The Trial Court erred by placing too much weight on highly subjective, inaccurate custody evaluation report and Guardian Ad Litem report."
 {¶ 7} Upon review, we find no merit in the appellant's arguments with the exception of his fourth assignment of error. The record does not reflect whether the trial court considered the payment of marital debts by the appellant during the parties' separation in determining that the marital property had been equitably divided. Accordingly, the judgment of the trial court will be reversed with respect to its division of marital property, and the matter will be remanded for further proceedings consistent with this opinion concerning that issue. In all other respects, the judgment of the trial court will be affirmed. *Page 3 
 I {¶ 8} Appellant and Lori Hamilton, nka Lovelass, ("Lori") were married on June 15, 1990 in Watseka, Illinois. They are the parents of two children — Sara, who was born on February 29, 1992, and Andrew, born on March 1, 1995.
 {¶ 9} In July 2004, Lori filed a complaint for divorce. Approximately five months later, the parties separated, with Lori and the two children leaving the marital home. For a period of 53 days, Ken had no interaction with the children. A temporary order was issued in February 2005 in which Ken was granted overnight visitation and parenting time with the children on Tuesdays and Thursdays, in addition to Friday afternoons until Sunday evenings on alternating weekends. The trial court modified this order in April 2005 upon objections by Lori. Thereafter, Ken was permitted visitation and parenting time with the children on Wednesday evenings and alternate weekends pursuant to the court's standard order of parenting time.
 {¶ 10} In May 2005, the trial court appointed Michael Williams, Ed.D., to complete a psychological evaluation of Lori, Ken and the two children in order to facilitate the court's determination of the allocation of parental rights. At the same time, the court itself scheduled an interview of the children. This interview, together with a telephone conference between the court and the parties' attorneys, served as the foundation upon which the trial court denied Ken's prior motion to vacate the April 2005 decision regarding temporary orders. However, the trial court amended parenting time in June 2005 to allow Ken Thursday overnights every other week. In August 2005, the court appointed attorney David Mesaros to serve as guardian ad litem for the children during the investigation and trial.
 {¶ 11} The matter proceeded to trial on April 26, 2006 and May 3, 2006. During *Page 4 
the trial, the court heard testimony from both parties and their witnesses. Specifically, Lori presented the testimony of Miriam E. Hoefflin, a licensed psychologist. The court summarized Dr. Hoefflin's testimony in its September 27, 2006 decision as follows:
 {¶ 12} "At trial, Miriam Hoefflin, the children's ongoing psychologist testified. Ms. Hoefflin had seen each child approximately 20 times, Mrs. Hamilton 21 times and Mr. Hamilton 16 times. Each session was 45 minutes to 1 hour in length. In addition, she reviewed written material by the parties.
 {¶ 13} "Ms. Hoefflin found that the children are very bonded to each other. They are good students and have good peer interactions. The children expressed concern about their relationship with their father. Ms. Hoefflin observed Mr. Hamilton with his children approximately 6 times and she found their relationship to be notably tense.
 {¶ 14} "Ms. Hoefflin noted the children's relationship with their father was not showing much progress. Each child reported they experienced diarrhea each time they visited him. Additionally, Sara would bite her nails and Andrew would vomit. Ms. Hoefflin determined after visits with their father the children exhibited both physical and mental health concerns. Mentally she found the children were having self-esteem eroded as the results of reported name-calling by the father. Sara reported her father telling her she is `mentally ill,' while Andrew reported being `afraid' of him.
 {¶ 15} "Ms. Hoefflin did note that the 53 day separation from their father that they experienced beginning in December 2004 was not healthy and it could well have contributed to much of the anxiety the children are now experiencing.
 {¶ 16} "Ms. Hoefflin recommends this family continue with ongoing therapy to help them improve their relationship. She reported that Mr. Hamilton is courteous, *Page 5 
mannerable, respectful and open to receiving assistance to improve the family interaction. She reported that Mrs. Hamilton could gain emotional support from more therapy." (Dec. at 7-8.)
 {¶ 17} Ken presented the testimony of two witnesses, Dr. Douglas Darnell, a licensed psychologist, and Neal Neitzel, a long-time friend. Again, the trial court summarized the testimony of these witnesses as follows:
 {¶ 18} "Dr. Douglas Darnell, a licensed psychologist testified. Dr. Darnell met with Mr. Hamilton 2 times and reviewed information provided to him by Mr. Hamilton.
 {¶ 19} "Dr. Darnell stated he found it reasonable to conclude that these children suffered from parental alienation syndrome. He noted that the longer this alienation occurs the more likely it will damage their global adjustment. He determined Lori is the root of the alienation.
 {¶ 20} "Dr. Darnell stated male children suffer more than female children from said alienation and that the results of the same are likely seen in the children's poor academic performance and poor self-esteem.
 {¶ 21} "Dr. Darnell suggests to assist this family they need the following: 1. To participate in reunification therapy; 2. To enlist the assistance of a special parent coordinator.
 {¶ 22} "Neil Neitzel, a friend of Mr. Hamilton, testified. Neal and [Ken] have been friends since their days at the University of Akron. Their families keep in touch over the years. He has observed [Ken] with the children at least 4 times from July 2005 until February 2006. The children and Ken interacted very well. There were obvious signs of affection exhibited between the children and Ken by ways of smiles and laughing." (Id. *Page 6 
at 8.)
 {¶ 23} Following the trial, the court reached its decision, designating Lori as the residential parent, and allowing Ken parenting time in accordance with the court's standard order of parenting time. In making this decision, the court considered the testimony and credibility of the parties and their witnesses at trial, in addition to the recommendations of the court-appointed psychologist, Michael Williams, and the guardian ad litem, David Mesaros. According to the court, Dr. Williams made the following observations and suggestions:
 {¶ 24} "1. Mrs. Hamilton exhibited no significant mental health functioning nor personality adjustment issues and evidenced a more than adequate level of parenting skill competence;
 {¶ 25} "2. Mr. Hamilton exhibited no diagnostically significant mental functioning nor personality adjustment issues but evidenced notably high levels of histronic (i.e., dramatic attention-getting) and narcissistic (i.e., self-absorbed and self-centered) personality traits and questionably adequate levels of parenting skill competence;
 {¶ 26} "3. Both minor children evidenced and expressed acute anxiety and tension, due primarily to transient situational factors related to the divorce in process, Andrew more than Sara, but no significant nor clinically diagnostic mental health functioning or personality adjustment problems;
 {¶ 27} "4. Both minor children empathically expressed the preference for and the hope of Mrs. Hamilton's being awarded custody and residential parent status;
 {¶ 28} "5. There is no evidence suggestive nor supportive of Mrs. Hamilton's alienating Sara and Andrew's affection from Mr. Hamilton; *Page 7 
 {¶ 29} "6. There is considerable evidence of Mr. Hamilton's being controlling, disingenuous, insensitive, and manipulative as the cause of the children's disdain of him as a parent and
 {¶ 30} "7. Mrs. Hamilton is determined to be best suited for custody and residential parent status and, in the best interests of the minor children, it is recommended that the Court designate her as such." (Dec. at 4.)
 {¶ 31} Similarly, the court noted the following recommendations of Mr. Mesaros, the guardian ad litem:
 {¶ 32} "1. Mother should be designated primary Custodian and Residential Parent of these children. Mother has clearly been the primary caregiver for the children throughout their lives and the children report being especially close and comfortable while in her care rather than in Father's. The Guardian does not believe a Shared Parenting Plan is workable or in these children's best interest and suspects that such a Plan would only add to the control and manipulation issues already being experienced by these parents.
 {¶ 33} "2. The Standard Order of Parenting Time should be awarded to Father. The Guardian makes this recommendation fully understanding that the children both expressed a desire to have no midweek visitation or overnight visitation with Father. The Guardian however believes that counseling for the children and perhaps with the whole family may improve the children's relationship with their Father. With such counseling, Mother may better learn how to be supportive of Father's interaction with the children and Father needs to learn more appropriate ways of treating the children and involving them constructing their time together. The Guardian does not believe that any of Father's actions to this time rise to the level necessitating supervised visitation. Still, *Page 8 
Father must understand the children's current feelings towards him and he must learn strategies to more effectively interact with them and deal with their anxieties.
 {¶ 34} "3. Father should not have extended overnight visitation with the children during Summer vacation until recommended by the children's counselor. Although the Guardian believes that it is likely that with a change in Mother's and Father's approaches to parenting time with the children extended Summer vacation time between Father and the children could be productive, the children's current mind set would make this a traumatic event for them. Due to the close geographical relationship of the homes, it would not be unmanageable if Mother and Father both cooperated to have periodic overnight midweek and/or weekend visitations rather than extended two week at a time periods. Both children voiced to the Guardian a `dread' of the upcoming Summer break in so far as it would include extended mandated time with Father. Both children quizzed the Guardian on how they may be able to `escape' from such a mandate and whether or not they would have to cooperate. The Guardian believes that without planning and attention from both Mother and Father for this extended time that the children are likely to rebel and at a minimum continue to withdraw from any meaningful relationship with Father.
 {¶ 35} "4. Both Father and Mother should be remindful that it is inappropriate to discuss their own relationship issues with the children and to speak disparagingly of the other parent to the children. Mother and Father must work together to provide a more unified front that encourages the children to carve out a meaningful relationship with both parents without having to sacrifice with the opposite parent. Similarly, the children should not be used by either parent to communicated [sic] information, messages, or *Page 9 
feelings to the opposite parent." (Dec. at 5-7.)
 {¶ 36} Incorporating the foregoing conclusions regarding the allocation of parental rights, the trial court issued a final decree and judgment of divorce on January 2, 2007. Included also were provisions addressing financial issues stipulated by the parties at trial. First, the court ordered that a second mortgage in the amount of approximately $45,552.00 will be equally divided, paying $22,776.00 to each party. The court further provided that the parties were to continue paying on the mortgage in accordance with their contract of indebtedness. Next, the court ordered that the couple's Beneficial indebtedness of $9,000.00 would be the sole responsibility of Lori and that she would indemnify Ken, creating a $4500.00 credit toward the total amount Lori owes Ken. As to the parties' timeshare, the court ordered that Ken would retain ownership and pay Lori $5000.00 as her interest. Finally, the court provided that each party would be responsible for any credit card in his or her name.
 {¶ 37} It is from this final divorce decree that Ken has filed a timely notice of appeal and raised the above-mentioned assignments of error.
 II {¶ 38} We will address Ken's first, second and fifth assignments of error together, as they are interrelated. Under these assignments of error, Ken contends that the trial court erred in designating Lori the custodial and residential parent, where the evidence demonstrated that she reinforced alienation of the children from Ken. Appellant also argues that the court erred in assigning parenting time under the Standard Order of Parenting Time of Montgomery County, Ohio because Ken was the primary caretaker of *Page 10 
the children during the three-year period prior to Lori's filing for divorce. Finally, Ken claims that the trial court placed too much weight on the psychological evaluation report submitted by Dr. Williams and the Guardian ad Litem report.
 {¶ 39} It is well-established that trial courts are guided by the factors set forth in R.C. 3109.04(F)(1) when making custody decisions, but they also are permitted broad discretion. Caldas v. Caldas, Montgomery App. No. 20691, 2005-Ohio-4493, at ¶ 9, citing Miller v.Miller (1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846. The Supreme Court of Ohio has stated that "[t]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record."Miller, supra (citations omitted.) Indeed, the issue of credibility is "even more crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." Davis v. Flickinger (1997), 77 Ohio St.3d 415, 419,674 N.E.2d 1159. Thus, a reviewing court will not reverse a custody determination unless the trial court has abused its discretion. SeeBeismann v. Beismann, Montgomery App. No. 22323, 2008-Ohio-984, at ¶ 20; Pater v. Pater (1992), 63 Ohio St.3d 393, 396, 588 N.E.2d 794. An abuse of discretion implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.
 {¶ 40} R.C. 3109.04(F)(1) provides that a court shall consider all relevant factors, including those outlined by this section, when determining the best interest of a child *Page 11 
involved in a custody dispute. As pertinent to the instant case, these factors are as follows:
 {¶ 41} "(a) The wishes of the child's parents regarding the child's care;
 {¶ 42} "(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
 {¶ 43} "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
 {¶ 44} " * * *
 {¶ 45} "(e) The mental and physical health of all persons involved in the situation;
 {¶ 46} "(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights."
 {¶ 47} R.C. 3109.04(F)(2) provides similar factors a trial court must consider, in conjunction with all relevant factors, when determining whether shared parenting is in the best interest of the children. Those factors are as follows:
 {¶ 48} "(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;
 {¶ 49} "(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;
 {¶ 50} "(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;
 {¶ 51} "(d) The geographic proximity of the parents to each other, as the proximity *Page 12 
relates to the practical considerations of shared parenting;
 {¶ 52} "(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem."
 {¶ 53} As discussed above, the trial court considered the testimony and reports of a number of individuals in determining that Lori should be granted custody of the children and designated the residential parent. Having thoroughly reviewed the record in this matter, we do not find that the trial court failed to follow the law.
 {¶ 54} Both Dr. Williams, the court-appointed psychologist, and Mr. Mesaros, the Guardian ad Litem, recommended that Lori be given residential status. Their recommendations similarly pointed to the fact that the children had a strained relationship with Ken and that they expressed a desire to remain in Lori's custody. The trial court reached the same conclusion after conducting an in-camera interview with the children on May 19, 2006.
 {¶ 55} Dr. Williams also examined the mental health of each party involved, finding Lori to possess personality traits that demonstrate a higher level of parenting competency than that demonstrated by Ken. Regarding the children, Dr. Williams and Mr. Mesaros indicated that both Sara and Andrew exhibited anxiety and tension on account of the events transpiring throughout the divorce. Dr. Williams additionally found that the children expressed disdain for Ken due to his "being controlling, disingenuous, insensitive and manipulating." (Dec. at 4.) Because of the children's mental states, Mr. Mesaros advised the court that the standard order of parenting time should be awarded to Ken until further counseling for the entire family helps to improve Andrew's and Sara's relationship with their father, and Lori and Ken learn how to work together to encourage *Page 13 
a healthy relationship between the children and both parents. "Domestic relations courts may, in the exercise of the discretion conferred on them, allocate parental rights to both parents under a shared parenting plan, or designate one parent as the residential parent and legal custodian of the child. It is not an abuse of discretion for a court to deny a motion for shared parenting when it determines that the parents lack the ability to cooperate and make shared parenting decisions."Puls v. Puls, Montgomery App. No. 20487, 2005-Ohio-1373, at ¶ 30
(citations omitted).
 {¶ 56} Morever, without addressing Appellant's third assignment of error, the trial court heard testimony from Lori's witness, Miriam Hoefflin, a licensed psychologist, that repeated the conclusions made by Dr. Williams and Mr. Mesaros. Dr. Hoefflin testified that the children were noticeably tense around Ken, having met with the three of them together six times. She also stated that this strained relationship affected the children physically and mentally. In opposition, Ken denied that the children routinely displayed physical signs of stress during visitations, although admitting to an isolated incident in which Andrew became nauseous and vomited allegedly due to car sickness.
 {¶ 57} Ken argues that the testimony presented by his witness, Dr. Darnell, demonstrates that Lori is to blame for his deteriorating relationship with the children, as Lori has attempted to make Ken's interaction with Sara and Andrew as difficult as possible. He specifically asserts that the trial court gave too little attention to the 53-day period beginning in December 2004 in which Ken had no contact with the children. According to Ken, Lori's action during that time amounted to kidnaping. Furthermore, Ken argues that Lori has encouraged the children to believe they are unsafe with Ken by giving them cell phones and telling them to call the police if they feel something is *Page 14 
wrong. He describes another situation where Lori began shouting at him at the children's school and threatened to call the police. Ken also claims that Lori has inappropriately shown Sara and Andrew court documents pertaining to the divorce. This behavior, according to Ken, exemplifies Lori's undertaking to alienate the children from their father.
 {¶ 58} The trial court considered Dr. Darnell's observations, noting that he believed the children suffered from parental alienation syndrome as a result of Lori's behavior. However, the trial court also heard testimony that Dr. Darnell met with Ken on only two occasions and that he had not met with Lori or the children at all. According to Dr. Darnell, his primary purpose was to determine within the context of a hypothetical based solely on information obtained by Ken whether Sara and Andrew exhibited behavior showing that alienation existed. The court also noted from Dr. Hoefflin's testimony that the period of separation from their father "was not healthy and could have contributed to much of the anxiety the children" experienced. (Dec. at 7.)
 {¶ 59} As we stated before, the trial court must be accorded broad discretion in custody matters. Here, although we are troubled by any testimony which suggests one parent disparages the other in the eyes of their children, the trial court was in the best position to examine the information before it, to decide credibility, and to choose to believe those witnesses who found Lori to be the more suitable custodian and residential parent. The trial court also was clearly able to determine whether a shared parenting plan was in the children's best interest at that point in time. We do not find that the trial's court decision amounts to an abuse of discretion. Accordingly, Ken's first, second and fifth assignments of error are overruled. *Page 15 
 III {¶ 60} Ken contends in his third assignment of error that the trial court should not have permitted Dr. Hoefflin to testify as an expert because she had a prior professional relationship with Lori and the children.
 {¶ 61} Preliminarily, we note that there is no dispute as to Dr. Hoefflin's qualifications as a psychologist, for the parties stipulated to this fact at the beginning of her testimony. The argument Ken makes on appeal is whether Dr. Hoefflin could provide unbiased testimony, where she testified that she met with Lori and the children approximately one month before Ken contacted her.
 {¶ 62} The record reflects that Dr. Hoefflin initially met with Lori on October 17, 2005 and Sara and Andrew on November 3, 2005. Thereafter, on November 17, 2005, Children's Services sent a letter to the parties in which Dr. Hoefflin was referred to the family as counselor. She eventually met with Ken in December 2005. Altogether, Dr. Hoefflin testified that she had seen the children in her office 20 times, Lori 21 times, and Ken 16 times. Six of the meetings with Ken were also attended by the children.
 {¶ 63} As we stated above, Dr. Hoefflin's testimony focused on her observations of the children's behavior generally and in the presence of Ken. She noted that Sara and Andrew were very bonded together and that they appeared to have good peer interactions. She further testified, however, that the children's relationship with their father involved an unhealthy amount of stress which manifested itself both physically and mentally.
 {¶ 64} Ken's attorney objected to Dr. Hoefflin's testimony on the grounds that her *Page 16 
role in the case was undefined. Specifically, counsel questioned whether Dr. Hoefflin was an individual therapist for Lori, or whether she also served as therapist for the children. In any event, counsel asserted that Dr. Hoefflin could not present herself as the appointed therapist for the family because that person had already been chosen-Dr. Michael Williams. On appeal, Ken claims that Dr. Hoefflin formed a bias during the month in which she only met with Lori that prevented her from subsequently being able to provide therapy to the entire family. In addition, he claims that Dr. Hoefflin's conclusions were not based on a thorough evaluation or tests.
 {¶ 65} Evidence of an expert's bias and/or interest in a particular matter is a legitimate subject of inquiry within the limits imposed by the trial court in the reasonable exercise of its discretion.Calderon v. Sharkey (1982), 70 Ohio St.2d 218, 224, 24 O.O.3d 322,436 N.E.2d 1008. Ultimately, then, "[a] trial court has the discretion to determine the admissibility of expert testimony, and an appellate court will not disturb such decisions in the absence of an abuse of that discretion." Anousheh v. Planet Ford, Inc., Montgomery App. Nos. 21960 21967, 2007-Ohio-4543, at ¶ 69 (citations omitted).
 {¶ 66} The record does not demonstrate that the trial court abused its discretion in the instant matter. Counsel for the appellant had the opportunity to cross-examine Dr. Hoefflin regarding her professional relationship with Lori and expose any evidence of undue bias which may have existed. The trial court, thereafter, was in the best position to assess Dr. Hoefflin's testimony concerning her observations of the children and their relationship with Ken, and determine if its probative value was outweighed by any danger of unfair prejudice. See Evid. R. 403(A). Upon reviewing the record, we find that the trial court's decision to allow Dr. Hoefflin to testify as an expert witness was *Page 17 
reasonable. Accordingly, Ken's third assignment of error is overruled.
 IV {¶ 67} Under his fourth assignment of error, Ken argues that the trial court erred by not addressing in the Final Decree and Judgment of Divorce certain joint debts of the parties that he paid in 2005 and 2006.
 {¶ 68} At the beginning of the trial, the parties stipulated to a number of financial matters, all of which became part of the final divorce decree. These financial matters included two mortgages on the marital estate, equaling $163,000.00 and $45,552.00 respectively. The parties agreed that Ken would take the real estate, and Lori would pay him one half of the second mortgage less one half of the estate's equity — in total, Lori would owe $14,276.00. Furthermore, Lori agreed to pay Ken $6272.00 for his share in retirement accounts, making her gross total of payments equally $20,548. From this amount, Ken agreed to deduct $7400.00 in temporary alimony. Ken also stipulated that he would pay Lori one half of a Beneficial loan, giving Lori a further credit of $4500.00. Finally, each party understood that he and she would pay the debts on their individual credit cards.
 {¶ 69} Having discussed these financial matters, the parties stated to the court the primary issue to be resolved at trial was child custody and visitation. Despite this position, Ken asserted that there were additional marital bills that he paid during the pendency of the parties' separation for which he should be reimbursed. Specifically, Ken claims that he is owed $688.00 toward Lori's credit card debt; $2237.00 over 13 months on a Beneficial Loan; $5094.00 on the second mortgage; $1530.00 toward the *Page 18 
Lando Timeshare between December 2004 and May 2006; and tuition for the period of December 2004 to May 2005, although he also testified that Lori had paid the tuition since May 2005.
 {¶ 70} Lori objected to the testimony concerning the aforementioned reimbursements on the grounds that the parties had entered into a private agreement to pay certain marital bills. Ken's attorney, however, denied that he was aware of such agreement.
 {¶ 71} A trial court has broad discretion when making a division of marital property. Bisker v. Bisker (1994), 69 Ohio St.3d 608, 609,635 N.E.2d 308. This Court, therefore, will not reverse the trial court's decision unless we find it was unreasonable, arbitrary, or unconscionable. Entingh v. Entingh, Montgomery App. No. 22117,2008-Ohio-756, at ¶ 5, citing Blakemore, 5 Ohio St.3d at 519.
 {¶ 72} Here, although the trial court is afforded broad discretion, we are unable to determine from the record whether this discretion has been abused. The court has not specifically addressed the issue of" marital debt" reimbursements put forth by Ken during the trial. Instead, it simply included in the divorce decree the parties' stipulations to financial matters discussed at the beginning of the trial. While this may be the trial court's way of providing that it believes the final divorce decree is a fair disposition of the marital property in light of the trial testimony, we reverse and remand this matter so that the court may make findings of fact addressing the debts Ken allegedly paid following the parties' separation and which he asserts should be reimbursed by Lori. Such findings, we believe, are necessary to clarify the trial court's determination that the marital property has been equitably divided. Accordingly, the fourth assignment of error *Page 19 
is sustained.
 {¶ 73} Having sustained Appellant's fourth assignment of error insofar as the record does not reflect whether the trial court addressed debts paid during the pendency of the parties' separation, the judgment of the trial court is reversed with respect to its division of marital property, and this matter is remanded for further proceedings consistent with this opinion concerning that issue. In all other respects, the judgment of the trial court is Affirmed.
FAIN, J., and WALTERS, J., concur.
(Hon. Sumner E. Walters, retired from the Third District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio). *Page 1