[Cite as *In re C.G.*, 2012-Ohio-5286.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 97950**

## IN RE: C.G.

## A Minor Child

**[Appeal by the State of Ohio]**

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Common Pleas Court
Juvenile Court Division
Case No. DL 11114359

**BEFORE:** S. Gallagher, J., Stewart, P.J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:** November 15, 2012

**ATTORNEYS FOR APPELLANT**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Brian Hoffman
Assistant Prosecuting Attorney
9300 Quincy Avenue, 4th Floor
Cleveland, OH   44113


**ATTORNEYS FOR APPELLEE**

**For C.G.**

David S. Bartos
20220 Center Ridge Road
Suite 320
Rocky River, OH   44116

**For Guardian Ad Litem**

William T. Beck
2035 Crocker Road
Suite 201
Westlake, OH   44145

SEAN C. GALLAGHER, J.:

{¶1} Plaintiff-appellant, the state of Ohio, appeals from the juvenile court's denial of its request for mandatory bindover of defendant-appellee, C.G. Without issuing an opinion, the trial court found probable cause did not exist to believe C.G. committed the offense of aggravated robbery in violation of R.C. 2911.01(A)(1).[1] For the reasons that follow, we affirm.

{¶2} The state argues in its sole assignment of error that the trial court erred in not ordering transfer because the victim provided credible evidence of every element of the offense of aggravated robbery to support a finding of probable cause to believe C.G. committed the offense. Because the trial court did not provide the reasoning behind its decision, C.G. focuses primarily on the alleged disparities arising from the testimony of the state's witnesses as justification for the court's decision. The state called two witnesses, the victim and a detective who investigated the robbery. The defense called two witnesses as well, C.G.'s girlfriend and his social worker.

{¶3} After grocery shopping on July 19, 2011, Julia Ivanova drove to her home located on Random Street in the "Little Italy" section of Cleveland. She parked her car, and observed two males on the side of the street. Ivanova went up the stairs of her

---

[1] The juvenile court found no probable cause, and yet did not dismiss the complaint against C.G. Rather, the court ordered that the matter proceed to adjudication pursuant to Juv.R. 30(E). *Compare In re D.T.F.*, 10th Dist. Nos. 05AP-03 and 05AP-04, 2005-Ohio-5245 (juvenile court dismissed complaints after determining there was no probable cause). *See also* fn. 3.

building, and one of the males ("Male 1") approached her and asked for directions to Case Western Reserve University. He meanwhile pulled out a gun from his pants pocket with the help of a second male ("Male 2") who had approached Ivanova from behind. Male 1 put the gun to Ivanova's head, and said, "give me your wallet." She set down everything she was holding at the time: two grocery bags, a cell phone, a credit card, her driver's license, and her car keys.

{¶4} Ivanova described the gun as a black, dark gray revolver. Ivanova did not have a wallet or purse. She, therefore, gave the males her groceries, cell phone, and a credit card. The males picked up and returned the driver's license and car keys to her before they left. After the incident, Ivanova went to a neighbor's home where she called 911 to report the incident. She eventually recovered her cell phone from the police.

{¶5} The robbery took place at approximately 10:00 p.m., or a little bit after 10:00 p.m. Although it was dark, there was a decent light near the entrance to her building. Ivanova could see "very well."

{¶6} Ivanova identified C.G. in court as Male 1, the male who held the gun to her head. There was no hesitation in her testimony that C.G. was Male 1. Ivanova identified him by his eyes, lips, and face. Ivanova explained that she could identify him "[b]ecause I looked at him when he was pointing the gun and I was looking to see if I would see some mercy in his eyes for a second and for a few minutes and that's why I looked as [sic] his face." She also recognized him as the taller of the two males.

Ivanova estimated that Male 1 was an arm's length away when he held the gun to her head.

{¶7} Defense counsel questioned Ivanova about her interview with a police officer. During that interview, Ivanova described Male 1 as being "very tall" and about 170 pounds. She stated that her husband was six feet three inches tall, and that Male 1 was probably taller than her husband. The height of Male 1 provided to 911 was five feet eleven inches. When questioned about this discrepancy, Ivanova explained that "I was shocked" when providing the first description as she was not ready to answer the question about Male 1's height. She, therefore, did not describe Male 1 during the 911 call as taller than her husband.

{¶8} As to Male 2, Ivanova initially described him to the police as five feet eight inches tall and about 160 pounds. During cross-examination, she described him as shorter than Male 1, "maybe six foot." Additionally, during direct examination, Ivanova stated both males were lighter skinned; during cross-examination, she testified Male 2 was "a lot lighter skinned" than Male 1. Ivanova described both males as being in their early twenties. Because neither male had his head covered, Ivanova could see that they both had very short black hair.

{¶9} Defense counsel asked Ivanova why she told the detective in a second interview that Male 2 was taller than Male 1. She responded that this was not accurate as Male 2 was shorter than Male 1 and "I do know that [the police] know that the second person was shorter."

**{¶10}** Ivanova went to the police station a few days later where she met with Detective Kelly to view photos. She testified that the detective presented two sheets of photos, and indicated the suspect was included in them. Ivanova took approximately 20 minutes to identify C.G. as Male 1, the male with the gun. When questioned why it took 20 minutes, she stated, "I just took my time to make sure that I'm identifying the correct guy." Ivanova testified earlier as well that she was sure about her identification of C.G.

**{¶11}** Ivanova then confirmed that Male 1 did not say anything about the gun during the incident. There were also no actions taken by him to hurt or strike her with the gun. She was, however, scared because she "looked into his eyes and I thought that it could be used."

**{¶12}** The state presented Detective Eugina Gray as its second witness. She testified that she met with Ivanova and her friend, Ms. Tittle, to review text messages between Ms. Tittle and a person using Ivanova's stolen cell phone. Det. Gray obtained Ivanova's permission to run a trace on her phone through the U.S. Marshals Service.

**{¶13}** On July 21, 2011, Cleveland police officers and members of both the Bureau of Alcohol, Tobacco, and Firearms and the U.S. Marshals Service set up a perimeter around the phone's suspected location in the 3500 block of East 74th Street and Union Avenue. The marshals identified a vehicle leaving a house as containing the cell phone. Det. Gray and another detective followed the car and made a traffic stop at Fleet Avenue and Broadway Avenue. The detectives recovered Ivanova's cell phone in the possession of Diandre Lott, one of the car's occupants, and arrested him for receiving

stolen property. Lott claimed to have bought the cell phone for $40 from a "crack head."

**{¶14}** Det. Gray thereafter obtained a search warrant for the cell phone. Phone records from the day before and day after the robbery revealed outgoing calls to two telephone numbers right after the robbery. Det. Gray searched the numbers and found they were attached to the same house where Lott left with the cell phone. According to Det. Gray, one of the numbers was that of C.G., and the other number was that of Etoya Jackson, the foster parent to both Lott and C.G. The telephone records also showed that one of the phone numbers called using the stolen cell phone listed back to a Jayvion Walden as well.

**{¶15}** Det. Gray next explained how she identified C.G. and Lott as suspects:

A. I did a computer check on the cell phone, on the outgoing numbers. I learned who the phone numbers were listed to. Created the suspect in question, the male that came back to the cell phone number fit the general description of the description that the victim had provided. I created a photo lineup to the victim.

Q. How many suspects did you have at that time?

A. Two suspects.

Q. Who were the two suspects?

A. Diandre Lott and [C.G.].

**{¶16}** The court questioned Det. Gray further:

Q. How could developing a photo list and address give you information that the person listed on the address met a suspect description?

A.   When I did a computer check of the cell phone number, of a phone number, that phone number was listed back to a specific person in the Cleveland Police Computer System.   I checked photos of that person and was able to generate a photo lineup.

Q.   Where was the photo derived from?

A.   The photos that I used were from OLEG, which is the Ohio Law Enforcement Gateway.   Everybody who has a driver's license [or state I.D.] picture taken is on this cite [sic].

{¶17} Defense counsel questioned Det. Gray:

Q. [Did] you check to determine whose phone that actually was listed in through any telephone records.   I mean, you were able to subpoena the phone records.   You didn't subpoena who it belonged to, who paid the bill?

A.   No, sir.

Q.   So you have no idea who paid the bill or who was actually listed with the phone company, correct?

A.   No, sir.
Q.   Okay, so essentially it came back to this house.   Not that it really came back at any one person because it came back to two of the people that were living there, correct?

A.   Correct.

Q.   Okay.   And you indicated well it couldn't be the [foster] mom, but we have this [C.G.] there, correct?

A.   Correct.

* * *

Q. [A]nd from that you gleaned that he should be in the photo array, correct?

A. Based upon what the victim had told me, yes.

{¶18} Det. Gray testified that she knew from the initial police report that Ivanova described the height of the robbers as five feet eleven inches, and five feet eight inches. When defense counsel questioned Det. Gray as to why she identified suspects who were taller, she stated that during her interview with Ivanova, Ivanova described them as being taller than as described in the 911 call.

{¶19} Further inquiry revealed that another person, Walden, lived in the house with C.G., Lott, and Jackson. Det. Gray explained that Walden's photo was not included in the photo arrays shown to Ivanova. If Ivanova had not identified C.G. from the photos, her next step would have been to show a third array that included Walden's photo. Although Lott's photo was included in the photo arrays presented to Ivanova, Ivanova did not identify him as Male 2.

{¶20} The court questioned Det. Gray further about her interview with Ivanova:

Q. What did [Ivanova] tell you happened?

A. She told me that she was going home. She was in her parking lot getting ready to enter the building. She saw a male walk up and she said that this male was asking her [for] directions to the Case Western Reserve University. When she was talking to him, giving him directions, *another male approached her from a different direction. And she described this male as taller* and that he had tighter pants on and he was fumbling trying to get a gun out of his pockets.

Ma'am, I can't remember the exact words that she explained to me. She said when she told them she didn't have money the shorter of the two males became angry and he was trying to help the taller of the two males get the gun out of his front pocket. That male became even more angered. She was carrying bags of groceries and she set them on the ground.

\* \* \*

Q. So am I to understand from the description that she gave you, the second, taller suspect, who was fumbling to get a gun out of his pocket, is that the same line?

A. Yes, ma'am.

Q. Approached after the first person asked for directions?

A. Yes, ma'am.

{¶21} As part of her investigation and based on Ivanova's description of the incident, Det. Gray identified Lott as a suspect for the shorter male who first asked Ivanova for directions. She identified C.G. as a suspect for the taller, second male who later approached Ivanova.

{¶22} Det. Gray wrote the follow-up to the original police report. She testified during recross-examination in connection with the report:

Q. Could you read for me starting from there down to about here.

A. Ivanova stated while parking her car she observed a young black early 20's man walking southbound on Random from Mayfield. This male approached her as she started to enter her apartment building. This male hailed her attention by asking [for] directions while another male approached from the opposite direction.

Q. Now, let me stop you there. Do you know who she was referring to when you wrote that report. Who was the first person, who did you indicate was the first person?

A. From the description I received from her the first person was, of course, the first suspect Diandre Lott or I can't say it was Diandre Lott. It was a first suspect.

\* \* \*

A.   Okay.   While looking around as if looking for surveillance cameras. *The first male then attempted to pull a handgun from his front pants pocket.*

Q.   Hold on one second.   *And you believed that to be Diandre Lott?*

A.   *I believed it was at the time.*

* * *

Q.   If you can skip down to the second circle where I have it marked.

A.   Ivanova described both males age as early 20's.   *The second male* had lighter complexion than the first.   He *appeared taller and had both ears pierced with large diamond earrings.*

Q.   *So your idea was that my client was the second person?*

A.   *Yes.*
Q.   Who is taller?

A.   Yes.

Q.   *Who didn't have the gun?*

A.   *He assisted the first male — you're right.   He assisted the first male in getting the gun out.*

Q.   *It also indicates that he has two pierced ears?*

* * *

Q.   *Okay.   So you do realize my client has only one pierced ear?*

A.   *Yes.*

* * *

THE COURT: [S]o Detective Gray, am I to understand that from your report you indicated that this shorter one who approached the victim first was the one who had the gun because it was the taller one who you suspected was [C.G.] assisted him in trying to get the gun out of his pocket?

A. After reading my report, ma'am — Could I read my report again, if you don't mind?

THE COURT: Actually, I do. In part I will say this for the report because as we try to identify one versus the other, the taller versus the [shorter], the different skin tones, back and forth, back and forth, you know, the victim did that too. So if you have some confusion I totally understand it because guess what I experienced I think the same thing.

* * *

[W]hat was said about the earrings?

A. That's just something she told me.

THE COURT: The person who did or did not have the gun, who was taller who was shorter. What did the person with the earrings do?

A. I would have to look at that report again. I didn't remember the earrings until I read it in the report this time.

THE COURT: She didn't remember the earrings either. * * *

A. The second male had a lighter complexion than the first, he appeared taller, and had both ears pierced with large diamond earrings. That's just what she told me.

(Emphasis added.)

{¶23} The defense presented C.G.'s girlfriend, Adrianne Michelle Dykes, as its first witness. She testified that she stayed at Jackson's house from July 18 through July 21, 2011. Dykes described C.G.'s hair as having a blond-like streak patch in the front of his head. His hair was a "high top" about two to three inches in height. When the trial court asked her whether C.G. had the streak in his hair from July 18 through the day she left Jackson's house on July 21, Dykes stated, "yes, ma'am."

**{¶24}** During cross-examination, Dykes testified Lott was not at Jackson's house at any time while she was there. When questioned by the court as to whether anyone else was in the house, Dykes responded that Walden was there. She described Walden as "light skinned, tall, he's probably about six foot exactly." When questioned about whether Walden and C.G. wear earrings, Dykes responded that Walden wears earrings, but not C.G., even though he has one pierced ear.

**{¶25}** Dykes pulled up a picture of C.G. on her cell phone, and testified as follows when questioned by the prosecutor and trial court:

Q. You're not sure when that picture was taken?

A. No, I'm not.

Q. But you said you [copied] it on July 24th?

A. Yes.

THE COURT: Would you describe it for me please?

A. It's a picture with [C.G.] he has his shirt off. He has a hat on, with it to the back so his blonde is showing in the front and that's it. You can't see his whole body.

Q. And his hair is quite short, correct?

A. It's the length that I said about three or two inches high.

**{¶26}** For its second witness, the defense introduced Tonya Spraggins, a social worker who supervises C.G. She confirmed that in early July, C.G. had a blonde streak about two to three inches wide from his forehead to the top of his head. Spraggins

testified that C.G. still had the blonde streak when he appeared for a court hearing on August 11, 2011:

A. [W]e had another court hearing where his hair was still dyed that color.

Q. When?

A. August 11th 2011. His hair was blonde on and around his birthday[, July 18]. When I saw him again it was still blonde when we went to the court hearing.

* * *

Q. [A]t some point he got a hair cut?

A. Yes.

Q. Do you know where he got the hair cut?

A. While he was detained at the Detention Center.

{¶27} During cross-examination, the prosecutor questioned Spraggins further on the timing of C.G.'s hair coloring:

Q. But you don't know if it was dyed before [his birthday]?

A. The foster parent was in violation prior to his birthday, which was on the 18th, informing me that she had dyed his hair without our permission. So it was already dyed. I just didn't see it on that particular day, the incident in question but it was still that color.

{¶28} R.C. 2152.12(A)(1)(b), provides as follows:

(A)(1)(b) After a complaint has been filed alleging that a child is a delinquent child by reason of committing a category two offense, the juvenile court at a hearing shall transfer the case if section 2152.10 of the

Revised Code requires the mandatory transfer of the case and there is probable cause to believe that the child committed the act charged.

{¶29} In *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, the Supreme Court of Ohio stated:

> When the state requests a mandatory bindover, the juvenile court determines whether the child is eligible for mandatory bindover according to the child's age, the nature of the act, and other circumstances, and whether probable cause exists to believe that the juvenile committed the act charged. R.C. 2152.10(A) and 2152.12(A)(1); Juv.R. 30(A). If the child is eligible for mandatory bindover and if probable cause exists to believe that the juvenile did commit the acts charged, the only procedural step remaining is for the court to enter the order of transfer. Juv.R. 30(B).

*Id*. at ¶ 11.

{¶30} We find initially that the acts charged in the complaint in this matter would constitute the offense of aggravated robbery, if committed by an adult, a category two offense. Further, it was stipulated that C.G. was 17 years old at the time of the offense. The charge therefore brings the case within the mandatory bindover provisions. R.C. 2152.10(A) and 2152.12(A)(1); Juv.R. 30(A).

{¶31} The probable cause standard for mandatory bindover requires the state to provide credible evidence of every element of an offense to support a finding of probable cause to believe that the juvenile committed the offense before ordering mandatory waiver of juvenile court jurisdiction pursuant to R.C. 2152.12(B). *State v. Iacona*, 93

Ohio St.3d 83, 93, 2001-Ohio-1292, 752 N.E.2d 937. Probable cause in this context is not guilt beyond a reasonable doubt; it is evidence that raises more than a suspicion of guilt. *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶16. This standard requires the juvenile court to "evaluate the quality of the evidence presented by the state in support of probable cause as well as any evidence presented by the respondent that attacks probable cause." *Iacona* at 93. Our review of the juvenile division's decision is mixed: we defer to the court's credibility determinations by reviewing for an abuse of discretion, but we conduct a de novo review of the legal conclusion whether there was probable cause to believe that the juvenile committed the charged act. *In re A.J.S.* at ¶ 1.

{¶32} Pursuant to *Iacona*, the juvenile court is required to evaluate the quality of the evidence presented by the state in support of probable cause as well as any evidence presented by C.G. that attacks probable cause. *Iacona* at 93. The trial court questioned Ivanova at length about the timing of events on July 19, including when she set down the groceries and other items in her hands. Her testimony varied from when the gun was put to her head to when she first spotted the second male, but not yet the gun. The court also questioned Det. Gray about how Ivanova described the timing of setting down the items. We do not, however, base our decision on this alleged disparity in Ivanova's testimony as she reasonably explained, "[i]t kind of all happened like at the same time."

{¶33} The quality of the state's evidence was inferior, however, as it relates to Ivanova's identification of C.G. as Male 1. According to Ivanova, the taller of the two

males approached her first to ask for directions.   The taller of the two males also pulled out the gun with the help of the shorter male.   According to Det. Gray, who interviewed Ivanova and wrote the follow-up to the police report, the shorter of the two males approached Ivanova first to ask for directions.   The taller of the two males appeared second, and he helped the shorter male pull out the gun from the shorter male's pocket. While during direct examination Det. Gray testified that the taller of the two males had the gun, she testified during both direct and cross-examination that it was the shorter of the two males who approached Ivanova first.   She also later testified that Ivanova told her the second male was taller, and had both ears pierced with large diamond earrings.

{¶34} Ivanova testified as an eyewitness whereas Det. Gray relayed information second-hand from memory of the interviews and the police report.   The state refers to the trial court's comments about the confusion created by the victim's and detective's testimony on skin tones and height.   The state argues that pursuant to *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, because the trial court was confused as well, it should have solely relied on Ivanova's identification as Male 1 and ordered bindover of C.G.

{¶35} In *In re A.J.S.*, the juvenile court made no factual findings in its entry denying transfer.   The court, however, expressed it could not recall the testimony about the positions of the persons at the scene of a shooting, and stated it would need to have that information in order to determine whether A.J.S. acted with purpose to kill.   Rather

than review the state's evidence concerning A.J.S.'s position, the court abused its discretion by ignoring this evidence. *Id*. at ¶ 56-27.

{¶36} Unlike the court in *In re A.J.S.*, the trial court here did not ignore the evidence when commenting on the confusion created by the state's evidence. In other words, it was the quality of the state's evidence that created the confusion, not the trial court's failure to recall or review the evidence. We, therefore, reject the state's argument that the court should have ordered the case to the general division of the common pleas court based solely on Ivanova's identification testimony.

{¶37} Moreover, C.G. presented evidence through defense witnesses that his hair had a two- to three-inch-wide blonde streak from his forehead to the top of his head from at least July 18 through August 11. C.G.'s hair was also at least two to three inches in height until after he was detained in the detention center as testified to by defense witness Spraggins, C.G.'s social worker. Ivanova testified, however, that both Male 1 and Male 2 had short black hair on July 19.

{¶38} Finally, C.G. presented evidence that the taller of the two males had two pierced ears and wore large diamond earrings on July 19. Det. Gray confirmed that C.G. has only one pierced ear, as testified to by defense witness Dykes as well.

{¶39} Here, the trial court did not specifically find the state's identification evidence was not credible. From the questions posed by the trial court to the witnesses for both the state and defense, however, it is apparent that the court questioned the

credibility of the state's eyewitness and her identification of C.G. as Male 1.[2]   Because the trial court is in a much better position to assess credibility, we must defer to that court's credibility determination.   *In re D.T.F.*, 10th Dist. Nos. 05AP-03 and 05AP-04, 2005-Ohio-5245; *In re Cline*, 2d Dist. No. 19082, 2002-Ohio-3280; *compare Caldas v. Caldas*, 2d Dist. No. 20691, 2005-Ohio-4493; *State v. Larew*, 7th Dist. No. 98-CA-168, 2000-Ohio-2622.

{¶40} Ivanova was the state's only eyewitness.   If her testimony at the probable cause hearing was not credible, there is no other evidence to establish every element of the offense necessary to support a finding of probable cause.   The trial court did not, therefore, abuse its discretion in finding the absence of probable cause.

{¶41} The state's sole assignment of error is overruled.

{¶42} The judgment of the trial court is affirmed.[3]

---

[2]   The juvenile court correctly noted that alibis and motions to suppress are not to be addressed at a probable cause hearing.   We are aware of the inferences in this case about an unduly suggestive photo array and identification procedure. Where the credibility of a sole eyewitness is so intertwined with how he or she identifies a suspect through an alleged unduly suggestive procedure, a more appropriate vehicle for determining the reliability of the identification is through a motion to suppress.

[3]   This is a unique case where the victim identified the defendant in court as the assailant, and yet the juvenile court concluded there was no probable cause to relinquish jurisdiction.   *See* fn. 2.   This was a mandatory, not discretionary, bindover proceeding.   *Compare In re J.S.*, 8th Dist. No. 92504, 2009-Ohio-3470 (juvenile court did not abuse its discretion in retaining jurisdiction in a discretionary proceeding because the evidence was sufficient to establish probable cause to believe appellant committed a lesser offense).   Our affirmance of the juvenile court's ruling leaves us in a quandary about C.G. and the next procedural step in this matter because the juvenile court neither dismissed the matter for lack of probable cause nor ordered bindover based upon probable cause. The questionable status of this case is not, therefore, a moot question that disallows an advisory

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile court division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

SEAN C. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, J., CONCURS;
MELODY J. STEWART, P.J., CONCURS IN JUDGMENT ONLY

---

opinion. *See Schwab v. Lattimore*, 166 Ohio App.3d 12, 2006-Ohio-1372, 848 N.E.2d 912 (1st Dist.); *State v. Bistricky*, 66 Ohio App.3d 395, 584 N.E.2d 75 (8th Dist.1990). Although the Double Jeopardy Clause of the Fifth Amendment applies to juvenile proceedings, *In re S.J.*, 106 Ohio St.3d 11, 2005-Ohio-3215, 829 N.E.2d 1207, ¶ 14, citing *In re Cross*, 96 Ohio St.3d 328, 2002-Ohio-4183, 774 N.E.2d 258, ¶ 23-24, that protection is only absolute upon the juvenile court's adoption of the magistrate's decision. *In re T.W.*, 8th Dist. No. 88818, 2007-Ohio-2775, citing *United States v. Bearden*, 274 F.3d 1031, 1036-1038 (6th Cir.2001). *See* Juv.R. 40(D)(4). Double jeopardy does not, therefore, bar an adjudicatory proceeding when the state dismisses and refiles a complaint following remand. *See In re J.S.*, 8th Dist. No. 94410, 2010-Ohio-6162. *See also* Juv.R. 22(B) (any pleading may be amended at any time prior to the adjudicatory hearing); *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, syllabus (juvenile court's denial of mandatory transfer is the functional equivalent of the dismissal of an indictment).