[Cite as *In re I.S.*, 2023-Ohio-3975.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE I.S. | : | |
| | : | No. 112364 |
| | : | |
| A Minor Child | : | |

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** November 2, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL22101893

---

### *Appearances:*

Rachel A. Kopec, *for appellee.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Gregory Ochocki, Assistant Prosecuting
Attorney, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Appellant the state of Ohio appeals the juvenile court's denial of its motion for a mandatory bindover of appellee I.S. to the general division of the Cuyahoga County Court of Common Pleas for the purpose of criminal prosecution pursuant to R.C. 2152.10(B). For the reasons that follow, we reverse the judgment and remand the matter with instructions to order the bindover.

## I.  Factual Background and Procedural History

{¶ 2} I.S. was born on October 3, 2004.  He was 17 years old on February 11, 2022.

{¶ 3} The state filed an 11-count complaint in juvenile court alleging that I.S. was a delinquent child because he committed acts that constitute the following crimes: aggravated murder in violation of R.C. 2903.01(A) and (B), murder in violation of R.C. 2903.02(A) and (B), aggravated robbery in violation of R.C. 2911.01(A)(1) and (3), discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), felonious assault in violation of R.C. 2903.11(A)(1) and (2) and improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B).  Almost all of the counts carried one- and three-year firearm specifications.

{¶ 4} The allegations stemmed from an investigation into the shooting death of Bryan Conley, who was found deceased in the driver's seat of a parked vehicle on Dudley Avenue in Cleveland on February 11, 2022.

{¶ 5} The state's theory of the case was that I.S. shot Conley during a drug robbery.  I.S. admitted in an interview with law enforcement that he was at the scene of the crime but claimed that he was just there to buy some marijuana from Conley; he said he ran away when he heard someone else firing the shots.

{¶ 6} The state moved for a mandatory transfer of I.S. to the general division for purposes of criminal prosecution.  The juvenile court held a probable-cause

hearing on October 11 and 12, 2022. The state called four witnesses during its presentation of evidence.

## A. The Testimony of Dr. Thomas Gilson

{¶ 7} Dr. Thomas Gilson testified that he is employed as the Cuyahoga County Medical Examiner and Crime Laboratory Director. The parties stipulated that Dr. Gilson is an expert in the field of forensic pathology.

{¶ 8} Dr. Gilson responded to the scene of Conley's death. Conley's body was in a parked car that was idling when he arrived. The vehicle and Conley's body were transported to the medical examiner's office. Investigators processed the vehicle and body for trace evidence and then Gilson supervised the autopsy of Conley.

{¶ 9} There were five gunshot wounds to Conley's body.

{¶ 10} Conley was shot in the left back, close to the spine; there was soot in the wound and an abrasion around the wound consistent with a muzzle impression, indicating that the muzzle of the gun was in contact with Conley's body when the shot was fired. The bullet traveled "from the back to the front, from the left side of the body to the right" and downward, breaking a rib and injuring Conley's aorta, causing significant bleeding.

{¶ 11} Conley was also shot in the upper left back; the evidence indicated that the muzzle of the gun was partially in contact with Conley's body when the shot was fired. The bullet traveled "from the back towards the front, from the left towards the right and in a downward direction." The bullet transected Conley's spinal cord and then passed through Conley's right lung and liver.

{¶ 12} Conley was also shot in the upper right back. This bullet damaged the liver and diaphragm and then the aorta and the iliac artery.

{¶ 13} Conley was also shot on the left side. The bullet traveled "from the top of the body towards the bottom" through soft tissues without damaging any organs. The wound was "very superficial."

{¶ 14} Conley was also shot in the left thigh, fracturing his femur. This bullet traveled "front to back."

{¶ 15} The gunshot wounds to Conley's trunk killed him and Gilson concluded that the manner of death was homicide. Toxicology testing revealed the presence of byproducts of cigarette and marijuana use in Conley's blood.

{¶ 16} On cross-examination, Gilson admitted that his examination did not reveal who shot Conley or how many people were involved in Conley's death. He further admitted that he did not know the order in which the bullet wounds were inflicted.

**B. The Testimony of Courtney Evans**

{¶ 17} Courtney Evans testified that she is employed as a Cleveland police patrol officer and has been so employed for seven years.

{¶ 18} On the evening of February 11, 2022, Evans was on patrol when officers in another squad car — who had been "touring for shots fired" — reported that they had found a male deceased on Dudley Avenue. When she arrived on scene, she observed a silver Nissan sedan; there was at least one cartridge case outside the car on the driver's side. There was a white male in the driver's seat, slumped over

the center console.  The car was running and the windshield wipers were operating. The driver's side door was partially opened; another officer had opened the door to assess the victim's status.

{¶ 19} Evans walked to a house across the street from the Nissan; the house had a home-security system.  Evans reviewed surveillance video captured by the system.

{¶ 20} The state played the recording in court.

{¶ 21} The recording depicts a dark-colored vehicle, which Evans identified as a Jeep sports utility vehicle ("SUV"), park on the north side of the street.  Evans described that a "taller slender male" wearing "some sort of white stripe going down the sleeve" (we refer to this person as "Person 1" in this opinion for clarity) then exits from the driver's side rear door of the Jeep.  At 6:39 p.m., Person 1 walks up a driveway to a house.  At 6:41 p.m., Person 1 walks back down the driveway and re-enters the SUV.  At 6:53 p.m., Person 1 exits the SUV again and walks back up the driveway toward the same house.

{¶ 22} At 7:31 p.m., Conley's silver Nissan parks on the north side of the street, two driveways in front of the Jeep.  Only the Nissan's rear bumper and part of the driver's side tail light are visible in the video after the Nissan parks; the rest of the car is obscured from the camera's view by a tree.

{¶ 23} Two people — one wearing black ("Person 2") and the other wearing a lighter color ("Person 3") — exit the Jeep from the passenger side and walk around

the rear of the Jeep.  They then walk to the passenger side of the Nissan.  By 7:31:37 p.m., both people are at the passenger side of Nissan.

{¶ 24} At 7:31:43 p.m., Person 3 starts walking back to the Jeep from the passenger side of the Nissan.  He knocks on the driver's side rear passenger window of the Jeep, and the window rolls down partially.  Person 3 appears to speak to someone or multiple people inside the Jeep, then begins walking back toward the Nissan.

{¶ 25} At 7:32:14 p.m., Person 1 (wearing the dark outfit with the white stripe) exits the Jeep from the driver's side rear door and begins walking toward the Nissan behind Person 3.  By 7:32:24 p.m., Person 3 is at the rear bumper of the Nissan on the passenger side; Person 1 is a few steps behind, approaching the driver's side.

{¶ 26} At 7:32:29 p.m., Person 3 disappears from view (behind the tree) on the passenger side of the Nissan.  Person 1 then disappears from view (behind the tree) on the driver's side.

{¶ 27} At 7:32:55 p.m., Person 3 begins walking back to the Jeep from the passenger side of the Nissan.  He walks past the Jeep on the driver's side and stands behind the Jeep, partially obscured from the camera's view by a column on the porch of the home with the surveillance system.

{¶ 28} At 7:33:31 p.m., Person 3 seems to approach the passenger side rear door of the Jeep, then returns to the rear of the Jeep, then walks to the front passenger side door of the Jeep, then returns to the rear of the Jeep.

{¶ 29} At 7:34:18 p.m., Person 3 runs back to the Jeep on the passenger side, as Person 1 (with the white stripe) runs back into view of the camera from the driver's side of the Nissan toward the Jeep. A few steps behind Person 1, Person 2 runs back toward the Jeep from the passenger side of the Nissan.

{¶ 30} Person 3 enters the Jeep on the passenger side. Person 1 enters the Jeep through the driver's side rear door, followed by Person 2 through the same door.

{¶ 31} At 7:34:35 p.m., the Jeep speeds away past the Nissan.

{¶ 32} At 7:37:24 p.m., a dark-colored SUV — which appears to be the same Jeep as left the scene a few minutes prior — returns into view of the camera from the direction it had previously driven. The SUV stops in the middle of the street and a person exits from the passenger side of the SUV and walks quickly to the passenger side of the Nissan.

{¶ 33} At 7:37:45 p.m., the person crosses to the driver's side of the Nissan across the rear of the Nissan.

{¶ 34} At 7:37:48 p.m., another person exits the SUV, from the driver's side, and jogs to the Nissan.

{¶ 35} At 7:38 p.m., the two people run back to the SUV and enter it. The SUV drives away.

{¶ 36} At 7:43 p.m., a police cruiser arrives at the scene.

{¶ 37} Evans testified that, after she reviewed this video with the homeowner who maintained the surveillance system, Evans approached the house

where Person 1 had walked up the driveway prior to the shooting. A female at the house told Evans that she "believes that whoever approached had some sort of connection with her daughter." Officers attempted to contact the daughter, a juvenile, but were unable to reach her. After speaking with the mother again, officers took a missing-person report on the daughter.

{¶ 38} On cross-examination, Evans admitted that she does not know the identity of any of the individuals in the surveillance video and cannot identify their races or ages; she called the people "males" because they appeared by stature to be male, but she is not sure. She further admitted that, because a tree is blocking the view of the Nissan's car doors, the video does not show if anyone ever enters the Nissan. Finally, she admitted that the surveillance camera did not capture any gunshots.

### C. The Testimony of S.G.

{¶ 39} S.G. testified that she is 16 years old. At the time of Conley's death, S.G. lived on Dudley Avenue with her mother and brother. S.G. knows I.S. because they "used to be friends and then he became my boyfriend at a time."

{¶ 40} S.G. met I.S. in January 2022 through the internet. They came to meet in person occasionally through February 11, 2022. I.S. would come to S.G.'s house on Dudley Avenue.

{¶ 41} S.G. met Z.D. (who was named in the state's complaint as a co-delinquent) through I.S. She would hang out with Z.D. once or twice a week in January into the beginning of February 2022. There came a time in early February

that I.S. and Z.D. came over to her house together; they drove together in a green Jeep.

{¶ 42} S.G. reviewed photographs on the stand and testified that Z.D. wears a jacket that looks like a jacket worn by one of the individuals in the surveillance video (the one "wearing half-and-half"). She said Z.D. is also the same height as the individual in the video.

{¶ 43} S.G. testified that she told detectives in February 2022 that one of the other individuals — Person 1, who wore the jacket with the white stripe down the sleeves — was I.S. But in her direct examination, she testified that she could not identify the person in the video "because there can be a lot of people who wear jackets like that."

{¶ 44} On February 11, 2022, I.S. called S.G. and "asked me where I was at." S.G. did not tell I.S. where she was.

{¶ 45} On cross-examination, S.G. admitted that she ran away from the Dudley Avenue house in October 2021 and was missing until February 2022.

{¶ 46} She further admitted that, while she considered I.S. to be her boyfriend, they only met up in person once or twice. She did not know I.S. very well.

{¶ 47} On redirect, S.G. clarified that in her interview with police, she said she thought she knew who the individuals in the surveillance photographs were — I.S. and Z.D. She also said that, despite her direct examination testimony that Z.D. and I.S. once showed up together at her house in a green Jeep, it was actually just Z.D. that showed up in the Jeep; I.S. was not with Z.D.

{¶ 48} In response to questions from the court, S.G. testified that she first thought of Z.D. and I.S. when police showed her still images from the surveillance video because she had seen them wearing similar clothing to the individuals in the images and the individuals in the images seemed to be of a similar height to Z.D. and I.S.  S.G. saw I.S. wear an Adidas jacket that looked similar to the clothing worn by Person 1 in the surveillance video when I.S. and S.G. first met in person.

**D. The Examination of Curtiss Jones**

{¶ 49} Curtiss Jones testified that he is employed as the supervisor of the trace evidence unit at the medical examiner's office.  He has been in that position for 20 years.  The parties stipulated that Jones is an expert forensic analyst in the field of trace evidence.

{¶ 50} There was a bullet hole on the underside of Conley's vehicle; there were no other bullet holes on the outer surface of the vehicle.  There were bullet holes on the driver's seat and on the floor under the driver's seat.  There were also bullet holes on the inside of the driver's door.  A bullet path was determined for two of the interior bullet holes; the bullets traveled "left-to-right, back-to-front at a steep downward angle."

{¶ 51} No marijuana or firearms were recovered from the vehicle.

{¶ 52} On cross-examination, Jones admitted that he swabbed the rear driver's side passenger area for DNA.

### E. The Examination of Jonathan Dayton

{¶ 53} Jonathan Dayton testified that he is employed as a detective with the homicide unit of the Cleveland Police Department. Dayton investigated Conley's death.

{¶ 54} Dayton arrived on scene on February 11, 2022. He found a spent .45-caliber cartridge case on the ground "just outside of the vehicle between the driver front and driver rear door." Dayton canvassed the area but did not locate anyone who reported witnessing the shooting.

{¶ 55} Arrest warrants were obtained for I.S. and Z.D. after the interview with S.G. When Z.D. was arrested, a .45-caliber handgun was recovered from the residence in which he was arrested. When I.S. was arrested, a 9 mm-caliber handgun was recovered from the residence in which he was arrested. Forensic ballistic tests revealed that neither recovered handgun fired the bullets that killed Conley.

{¶ 56} Dayton and other detectives interviewed I.S. after his arrest. The state played a recording of the interview.

{¶ 57} In the interview, I.S. initially denied being at the scene of the crime. He said that he was at his sister's house all day on the day of the murders. He also initially denied knowing anyone who lived on Dudley Avenue. When investigators showed I.S. the surveillance videos of the incident, I.S. adamantly denied that it was him in the video.

{¶ 58} Later in the interview, I.S. admitted that he was there. He admitted that he traveled in the black SUV to Dudley Avenue and walked up to the victim's car. He says his intention was to buy marijuana from the victim. He said that the victim weighed the marijuana while I.S. was at the car and then the victim invited I.S. to smell the marijuana. I.S. continued to deny that he shot Conley and claimed that another person in the SUV was the shooter. He claimed that the bullets came from Conley's right, as though from the front passenger area. He also admitted that he knew someone who lived on Dudley Avenue — S.G.

{¶ 59} On cross-examination, Dayton admitted that the surveillance video does not clearly capture the face of any of the suspects. He further admitted that the swabs from the Nissan were inconclusive for DNA; nothing in the DNA report indicated statistical support for a match to I.S.'s DNA.

{¶ 60} Dayton further admitted that he had no information that I.S. drank alcohol or smoked marijuana before his interview; Dayton said that I.S. did not appear to be under the influence of alcohol or drugs during the interview.

{¶ 61} Dayton admitted that the investigation revealed that Bryan Conley sold marijuana and that I.S. would purchase marijuana from him from time to time.

**F. The Trial Court's Findings**

{¶ 62} On December 29, 2022, the juvenile court found no probable cause to believe I.S. committed any of the acts alleged in the complaint and therefore denied the state's motion for a bindover. The court reasoned as follows:

> [T]he Court did not find that there was reasonable cause to believe that the child had a firearm on his person and displayed the firearm,

brandished it, indicated that he possessed it or used to commit the acts alleged.

And therefore, in pertinent part, the theory of the case then would be based on, in my opinion, a great deal on complicity. And * * * the complicity statute does not apply in juvenile bind over — to the juvenile bind over criteria.

**{¶ 63}** The state appealed, raising the following assignment of error:

The trial court erred as a matter of law when it found no probable cause to believe the juvenile committed the offenses charged in the juvenile court complaint.

## II. Law and Analysis

### A. Bindover Proceedings and Standard of Review

**{¶ 64}** "Juvenile courts possess exclusive jurisdiction over children alleged to be delinquent for committing acts that would constitute a crime if committed by an adult." *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, ¶ 11, citing R.C. 2151.23(A). However, under certain circumstances, the juvenile court "has the duty" to transfer a case, or bind a juvenile over, to the adult criminal system where the juvenile may be tried as an adult and face criminal sanctions. *In re M.P.* at ¶ 11, citing R.C. 2152.10 and 2152.12. There are two types of transfers under Ohio's juvenile justice system — mandatory transfers and discretionary transfers. *State v. D.W.*, 133 Ohio St.3d 434, 2012-Ohio-4544, 978 N.E.2d 894, ¶ 10.

**{¶ 65}** "'Mandatory transfer removes discretion from judges in the transfer decision in certain situations.'" *Id.*, quoting *State v. Hanning*, 89 Ohio St.3d 86, 90, 728 N.E.2d 1059 (2000); R.C. 2152.12(A). "'Discretionary transfer * * * allows judges the discretion to transfer or bind over to adult court certain juveniles who do

not appear to be amenable to care or rehabilitation within the juvenile system or appear to be a threat to public safety.'" *D.W.* at ¶ 10, quoting *Hanning* at 90; R.C. 2152.12(B).

{¶ 66} R.C. 2152.12(A)(1)(a) states, in relevant part:

> After a complaint has been filed alleging that a child is a delinquent child for committing one or more acts that would be an offense if committed by an adult, if any of those acts would be aggravated murder, murder, attempted aggravated murder, or attempted murder if committed by an adult, the juvenile court at a hearing shall transfer the case if * * * [t]he child was sixteen or seventeen years of age at the time of the act charged that would be aggravated murder, murder, attempted aggravated murder, or attempted murder and there is probable cause to believe that the child committed the act charged.

{¶ 67} In other words, if a child is eligible for mandatory bindover and if probable cause exists to believe that the juvenile committed the act charged, the juvenile court must enter an order of transfer. *In re C.G.*, 8th Dist. Cuyahoga No. 97950, 2012-Ohio-5286, ¶ 29; *In re M.P.* at ¶ 11; Juv.R. 30(B) ("In any proceeding in which transfer of a case for criminal prosecution is required by statute upon a finding of probable cause, the order of transfer shall be entered upon a finding of probable cause.").

{¶ 68} To establish probable cause in a bindover proceeding, the state has the burden to present credible evidence supporting each element of the offense. *State v. Iacona*, 93 Ohio St.3d 83, 93, 752 N.E.2d 937 (2001). Probable cause in this context requires "credible evidence that 'raises more than a mere suspicion of guilt,'" but does not require evidence of guilt beyond a reasonable doubt. *In re D.M.*, 140 Ohio St.3d 309, 2014-Ohio-3628, 18 N.E.3d 404, ¶ 10, quoting *Iacona* at 93. In

other words, probable cause in this context is ""a fair probability, not a prima facie showing, of criminal activity."" *State v. Martin*, 8th Dist. Cuyahoga No. 108996, 2021-Ohio-1096, ¶ 32, quoting *State v. Starling*, 2d Dist. Clark No. 2018-CA-34, 2019-Ohio-1478, ¶ 37, quoting *State v. Grimes*, 2d Dist. Greene No. 2009-CA-30, 2010-Ohio-5385, ¶ 16; *see also In re B.W.*, 2017-Ohio-9220, 103 N.E.3d 266, ¶ 20 (7th Dist.) ("Probable cause is a flexible concept grounded in fair probabilities which can be gleaned from considering the totality of the circumstances."), citing *Iacona* at 93. Probable cause is "'a reasonable ground for belief of guilt.'" *In re B.W.* at ¶ 20, quoting *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). It does not require a showing that a belief is correct or that it is more likely true than false. *In re B.W.* at ¶ 20, citing *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *see also In re J.R.*, 8th Dist. Cuyahoga No. 110241, 2021-Ohio-2272, ¶ 32.

{¶ 69} In considering whether probable cause exists, the juvenile court must "evaluate the quality of the evidence presented by the state in support of probable cause as well as any evidence presented by the respondent that attacks probable cause" to determine whether the state has presented credible evidence going to each element of the offense charged. *Iacona* at 93. However, "while the juvenile court has a duty to assess the credibility of the evidence and to determine whether the state has presented credible evidence going to each element of the charged offense, it is not permitted to exceed the limited scope of the bindover hearing or to assume the role of the ultimate fact-finder." *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-

5307, 897 N.E.2d 629, ¶ 44; *In re D.M.*, 140 Ohio St.3d 309, 2014-Ohio-3628, 18 N.E.3d 404, at ¶ 10.

{¶ 70} The juvenile court's probable cause determination in a mandatory bindover proceeding involves questions of both fact and law. *In re A.J.S.* at ¶ 1, 51. As a result, our review of the juvenile court's decision is mixed. We defer to the juvenile court's determinations regarding witness credibility, reviewing those determinations for abuse of discretion. However, whether the state has presented sufficient evidence to support a finding of probable cause is a question of law we review de novo, without any deference to the juvenile court. *In re C.G.*, 2012-Ohio-5286, at ¶ 31; *In re A.J.S.* at ¶ 1, 51.

## B. Elements of the Charged Offenses

{¶ 71} At issue here are the charges against I.S. for what would be aggravated murder in violation of R.C. 2903.01(A) and (B), murder in violation of R.C. 2903.02(A) and (B), aggravated robbery in violation of R.C. 2911.01(A)(1) and (3), discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), felonious assault in violation of R.C. 2903.11(A)(1) and (2) and improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B). I.S. was 17 years old at the time of the alleged offenses, making transfer mandatory if there is probable cause to believe he committed the offenses.

{¶ 72} A person commits aggravated murder by "purposely, and with prior calculation and design, caus[ing] the death of another" or by "caus[ing] the death of another * * * while committing or attempting to commit, or while fleeing

immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape." R.C. 2903.01(A), (B).

{¶ 73} A person commits murder by "purposely caus[ing] the death of another" or "caus[ing] the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of [R.C.] 2903.03 or 2903.04 * * *." R.C. 2903.02(A), (B).

{¶ 74} A person commits aggravated robbery by doing one of the following in attempting or committing a theft offense or in fleeing immediately after the attempt or offense: having a deadly weapon on or about the offender's person or under the offender's control and either displaying the weapon, brandishing it, indicating that the offender possesses it, or using it or inflicting, or attempting to inflict, serious physical harm on another. R.C. 2911.01(A)(1), (3).

{¶ 75} A person commits the offense of discharge of a firearm on or near prohibited premises by discharging a firearm upon or over a public road or highway. R.C. 2923.162(A)(3).

{¶ 76} A person commits felonious assault by knowingly causing serious physical harm to another or by causing or attempting to cause physical harm to another by means of a deadly weapon. R.C. 2903.11(A)(1), (2).

{¶ 77} A person commits the offense of improperly handling firearms in a motor vehicle by knowingly transporting or having a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle. R.C. 2923.16(B).

**C. Probable-Cause Analysis**

{¶ 78} At this stage of the proceedings, the state was not required to prove the truth of the allegations against I.S. It had to present credible evidence showing probable cause supporting each element of the offenses charged. Based on the evidence presented at the probable-cause hearing, we agree with the state that its evidence raised more than a mere suspicion of I.S.'s guilt; the state's evidence created a fair probability that I.S. committed the acts with which he had been charged.

{¶ 79} As detailed above, I.S. admitted that Conley was a marijuana dealer and that I.S. had purchased marijuana from him in the past. I.S. further admitted that I.S. was picked up from his sister's house on February 11, 2022, in the dark-colored SUV that was captured on the surveillance video. After initially denying that the surveillance video captured him, I.S. ultimately admitted that his denial was false and that the video recorded him. His admission is corroborated by S.G.'s testimony that she knew I.S. to wear a jacket that looked like the jacket worn by Person 1 in the video.

{¶ 80} I.S. admitted that he approached the victim's vehicle on the driver's side and sat in the backseat behind the victim for some period of time. If I.S. is

Person 1, as the state believes, I.S.'s admission that he approached the driver's side is corroborated by the video evidence. I.S. said that Conley began weighing marijuana and asked him to smell the marijuana.

{¶ 81} While I.S. denies shooting Conley, the physical evidence contradicts I.S.'s statement that the gunshots came from Conley's right (the front passenger area). Two of the shots were fired when the gun was in contact or partial contact with the victim and the bullets in Conley's back traveled "from the back to the front, from the left side of the body to the right" and downward. Moreover, a bullet path was determined for two of the interior bullet holes in the vehicle; the bullets traveled "left-to-right, back-to-front at a steep downward angle."

{¶ 82} Considering this forensic evidence, there is more than a fair probability that the fatal gunshots were fired from behind and to the left of Conley as he sat in the driver's seat — from the inside or the outside of the Nissan on the driver's side, as the state believes.

{¶ 83} While there were at least two people — Person 1 and Person 2 — at Conley's Nissan when the state believes the shots were fired (just before everyone ran back to the SUV), according to the surveillance video only Person 1 had approached the Nissan on the driver's side. I.S. places himself on that side of the car when the shots were fired.

{¶ 84} Minutes after the SUV speeds away, it returns to the crime scene. Individuals from the SUV exit and walk around both sides of the Nissan. By the time police arrive, there is no marijuana in the vehicle.

{¶ 85} The tree obscures the passenger compartment of the Nissan; the camera may not have captured if Person 2 walked around the front of the car to the driver's side, after initially approaching on the passenger side. The camera may not have captured if some unidentified third party approached the car from an angle obscured by the tree. I.S.'s counsel also suggested at the hearing that I.S. may have been under the influence of alcohol and marijuana when he talked to police. We also note that there has been no DNA recovered from the crime scene that links I.S. to the scene and, further, that the gun recovered from the home where I.S. was arrested was excluded as the weapon that fired the fatal bullets. But at this stage of the proceedings, the state need not prove its case beyond a reasonable doubt.

{¶ 86} The state's evidence, including I.S.'s own statements about the shooting, support a fair probability that Conley was shot to death on a public roadway and robbed of, at least, the marijuana he had brought with him. The evidence supports a fair probability that I.S. — the only person who approached the victim's car on the side where the shots seem to have been fired, who placed himself at the spot from which those shots seem to have come and whose story about another shooter from the passenger side is contradicted by the evidence — pulled the trigger.

{¶ 87} We do not consider whether the state proved I.S. guilty beyond a reasonable doubt; that is a question for the ultimate factfinder if this case gets to trial. We also do not consider issues of trial admissibility with respect to the state's evidence, an issue that has not been raised in this appeal. The only issue presently

before us is whether the state established probable cause at the bindover hearing. Having concluded that it did establish probable cause, we must reverse the trial court's finding of no probable cause.

{¶ 88} We, therefore, sustain the state's assignment of error.

{¶ 89} When a reviewing court reverses a juvenile court's finding of no probable cause and finds sufficient probable cause in a mandatory transfer case, the proper remedy is to reverse and remand with instructions to enter a mandatory transfer order. *See In re B.W.*, 2017-Ohio-9220, 103 N.E.3d 266, at ¶ 52–53, citing *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, at ¶ 65. Accordingly, the juvenile court's order is reversed and the case is remanded with instructions to enter an order of mandatory transfer.

## III. Conclusion

{¶ 90} Having sustained the state's sole assignment of error for the reasons stated above, we reverse the judgment. We remand this matter with instructions to enter an order of mandatory transfer.

It is ordered that appellant bear the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
MICHELLE J. SHEEHAN, J., CONCUR